REDACTED VERSION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA,


     - against -                                No. 20 Cr. 57-21 (GBD)


QUAVEON ROSS,


        *Defendant.*

-----------------------------------------------------------X




*SENTENCING MEMORANDUM*
*ON BEHALF OF*
*QUAVEON ROSS*




*Richard J. Ma, Esq.*
*20 Vesey Street, Suite 400*
*New York, New York 10007*
*Tel: (212) 431-6938*
*richardma@maparklaw.com*

*Kathleen O'Boyle, MSW*
*1125 Lorimer Street, 4C*
*Brooklyn, New York 11222*

REDACTED VERSION

# RICHARD J. MA, ESQ.

20 Vesey Street, Suite 400
New York, New York 10007
Tel:  (212) 431-6938
Fax:  (212) 964-2926
E-mail:  richardma@maparklaw.com


September 12, 2022


*__Via ECF and E-Mail__*
Honorable George B. Daniels
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

　　　　　Re:　　*United States v. Quaveon Ross*
　　　　　　　　20 Cr. 57-21 (GBD)

Dear Judge Daniels:

　　　　This sentencing memorandum is submitted in support of Mr. Quaveon Ross, the above-referenced defendant, to assist the Court in its determination of an appropriate and reasonable sentence pursuant to Title 18 U.S.C. § 3553.  Mr. Ross is scheduled to be sentenced on September 21, 2022.


## INTRODUCTION

　　　　Those of us who are fortunate enough to be blessed with family stability and responsible parenting receive guidance, positive influence and material support.  Character and values are learned.  Assistance is given to overcome challenges and there is opportunity to develop and reach one's potential.  Quaveon Ross, however, never had such guidance, structure or support in his childhood.   Instead, Quaveon Ross suffered shocking levels of abuse and neglect during childhood and adolescence, leading to lasting trauma and lifelong substance abuse.   His resulting criminality was unsurprising, even predictable.

**REDACTED VERSION**

We respectfully submit that a thorough consideration of Mr. Ross' history and characteristics demonstrate that the United States Sentencing Guidelines ("Guidelines") are inadequate to provide guidance toward the determination of the appropriate sentence. The Guidelines fail to consider key elements of Mr. Ross' background and circumstances of the offense necessary to any assessment of the just and reasonable punishment in this matter.  Nor do the Guidelines account for the impact of that history on Mr. Ross' criminality and his participation in the offense of conviction.  They rely instead on rigid, mathematical calculation and result in a myopic sentence which is solely punitive and fails to offer a definitive, long-term solution to lessen the likelihood of recidivism.  The advisory Guidelines, by its failure to consider the history and characteristics of Mr. Ross, are little more than an empty mathematical exercise, which renders them a less than meaningful measurement by which to formulate a sentence.

Clearly the seriousness of the instant offense, as well as the need to provide just punishment and adequate deterrence are important factors for the Court's consideration in its determination of the proper sentence.  We also realize that Mr. Ross' criminal history, infractions while incarcerated, as well as the instant offense conduct create a negative impression, one that the Government will no doubt emphasize at sentencing.  However, a vital goal of the criminal justice system is to balance the value of deterrence and punishment against its destructive effects, while also accounting for the capacity for positive change and rehabilitation.  As we will elaborate herein, our sentencing request is grounded in the awareness that Mr. Ross is fundamentally a good person whose criminality is the result of a tragic confluence of events and circumstances.   Importantly, he is at a crossroads in his life, with a still-salvageable future.  While his responsibilities and financial demands will grow, he has a limited education and little employment history or vocational prospects.  In order to move forward as a contributing member of society, Mr. Ross needs assistance and guidance to overcome his clear deficiencies and break the cycle instigated by his issues.

This submission therefore respectfully requests that the Court, as directed by 18 U.S.C. § 3553, look with particular emphasis at Mr. Ross' history of mental health issues and substance abuse to understand the individual and the context of the instant offense conduct to arrive at a sentence more reasonable and appropriate than that advised by the Guidelines.  One that is "sufficient, but not greater than necessary" to accomplish the goals embodied in the Sentencing Reform Act.  Significantly, the United States Department of Probation for the Southern District of New York ("Probation"), agrees that in the case of Quaveon Ross, the Guidelines recommendation is greater than necessary to address the goals of sentencing.   Probation recommends the minimum sentence of 60 months of incarceration, and in support of its recommendation, Probation referenced Mr. Ross' troubling personal history and circumstances.  (*See* Pre-Sentence Investigation Report ("PSR") at pp. 35-37).  For all the reasons set forth below, we submit that the appropriate and reasonable sentence includes the minimum term of 60 months of incarceration with the Court's recommendation that Mr. Ross be designated to the Federal Medical

REDACTED VERSION

Center in Lexington, Kentucky ("FMC-Lexington") — the only facility in the Bureau of Prisons that offers dual treatment for the Mentally Ill and Chemically Addicted ("MICA"). We further request that the Court's sentence include a 2 year period of supervised release with the specific mandate that Mr. Ross participate in an outpatient MICA treatment program, with vocational and educational components. This sentence is an onerous and meaningful punishment that will require Mr. Ross to repay our society for his transgressions, while still allowing him to better himself and cultivate a productive future. Should Mr. Ross fail to meet all that is required of him, the Court will be empowered to impose additional punishment. Further incarceration, however, offers society a punishment of comparatively little value that would have destructive consequences on Mr. Ross. It would do nothing to prepare Mr. Ross for his future and only enhances the likelihood that he will again have to resort to criminality.

## BACKGROUND

On March 30, 2022, Quaveon Ross pled guilty to Count One of the Superseding Information pursuant to a plea agreement. Under the terms of the plea agreement, Mr. Ross pled guilty to conspiracy to distribute and possess with intent to distribute 28 grams and more of crack-cocaine, in violation of Title 21 U.S.C. §§ 846 and 841(b)(1)(B). The plea agreement contained the following advisory Guidelines calculations: (i) a base offense level of 26, because the offense involved 112 to 196 grams of crack-cocaine, pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(7); (ii) a 2-level increase because a dangerous weapon was possessed, pursuant to U.S.S.G. § 2D1.1(b)(1); (iii) a 3-level reduction for timely acceptance of responsibility; and (iv) at adjusted offense level 25, in Criminal History Category IV, an advisory Guidelines sentencing range of 84 – 105 months of incarceration.

Although the plea agreement precludes the parties from advocating for any departures, the parties reserved the right to seek a non-Guidelines sentence pursuant to the application of the factors enumerated in Title 18 U.S.C. § 3553(a).

## QUAVEON ROSS'
## PERSONAL AND FAMILY HISTORY

Mr. Ross is a shy and guarded 25 year-old whose life choices have been severely undermined, often by conditions over which he had no control and for which he is blameless. It is evident that, from birth, Mr. Ross never possessed even a remote chance to succeed in life. No one willfully chooses a childhood filled with neglect, abuse and psychological disorder. No 9 year-old child should want to end his life. Mr. Ross' disturbing history is undoubtedly the origin of emotional and psychological problems which led to self-medicating substance abuse and resulting criminal conduct. Although we certainly

REDACTED VERSION

recognize that Mr. Ross has made wrongful choices in his life, we submit that many of these decisions were made in the context of his destructive and toxic background and surroundings.

### Formative Years and Family Life

Quaveon Antonio Ross was born on April 22, 1997, in the Bronx.  (PSR ¶ 89). Mr. Ross' father, Warrick Lorenzo Ross (51 years-old), is currently serving a life sentence in Florida on a murder conviction.  (*Id.*).  Mr. Ross' mother, Cherise Polk (49 years-old), is a nursing assistant who resides in Connecticut.  (*Id.*).  Mr. Ross has two full siblings: twin sister Quatiya Ross (25 years-old), who works as a security guard and resides in Queens, New York; and Tyreek Ross (24 years-old), who resides in New York.  (*Id.*).  Mr. Ross also has three maternal half-siblings: Carla Monroe (30 years-old), who resides in New Jersey; Jose Gonzalez (28 years-old), who works for a hospital and resides in Florida; and Jahnique Hardy (18 years-old), a student who resides in Connecticut with their mother.  (*Id.*).

Mr. Ross' childhood was wrecked from the outset by his parents.[1]  He was likely exposed *in utero* to alcohol, marijuana and nicotine and he was born premature.  (*See* Forensic Psychological Assessment of Jessica Pearson, Psy.D. ("Pearson Report"), submitted herewith as Exhibit A, at p. 2).  Mr. Ross' mother, tasked with providing for and raising five children, was simply not fit to be a parent.  By the time Quaveon Ross was 1 year-old, he and two siblings were placed in foster care.  (*See* PSR ¶¶ 91, 101).

When Mr. Ross was still an infant, and around the time of the ACS investigation, his father was incarcerated on the murder charge that eventually led to conviction and life sentence.  (*See* PSR ¶¶ 89, 101).  They never had any relationship apart from a few telephone calls and Mr. Ross received no life guidance from his father except for the legacy of violence and crime.  (*See* PSR ¶¶ 91, 101).

---

[1] Mr. Ross' history is well-documented in voluminous records from the New York City Department of Education ("DOE"), New York City Administration for Children's Services ("ACS") and the New York State Office of Children and Family Services ("OCFS"), among others.  These records are not submitted here due to privacy concerns.  However, upon request, the complete records can be produced for review with a request for sealing.  (*See, e.g., United States v. Monge*, 2020 WL 3872168, at *1 n.1 (S.D.N.Y. July 9, 2020) (Torres, J.) (finding the defendant's "privacy interest in his medical records outweigh the public right of access to judicial documents, and [permitting] those filings to remain under seal").

**REDACTED VERSION**

It was not until Quaveon Ross was 5 years-old that the family was reunited. (*See* PSR ¶¶ 91, 101). Mr. Ross and his siblings lived with their mother and Donovan Hardy, the father of Mr. Ross' youngest half-sibling. Even after the reunification, traumatic events continued, as reflected by ACS investigations and criminal acts throughout Mr. Ross' childhood. (*See* PSR ¶¶ 92-94). The family was poor and food was scarce. (PSR ¶ 92). Mr. Ross' mother and Mr. Hardy favored other siblings and, even worse, Mr. Ross was singled out for awful abuse. Mr. Ross vividly recalls daily verbal abuse and physical assaults with open hand, closed fist, shoes, belts and whatever else they could get their hands on. As just a child not yet even 10 years-old, he was repeatedly hospitalized as a result of the beatings. (*See* PSR ¶¶ 93, 101). Mr. Ross hid the scratches, bruises and marks to avoid school authorities finding out; the young child was already aware of the specter of removal. (*Id.*). When Mr. Ross was 10 years-old, his mother began regularly kicking him out of the home because by then he was resisting the violence. (PSR ¶ 95).

Thus, not only did Mr. Ross receive next to no guidance or supervision as a child, he was repeatedly and consistently exposed by his own parents to domestic violence, substance abuse, psychological trauma and criminality. Despite the mistreatment, Mr. Ross still carries conflicting, unreconciled feelings about his mother. Although resentful of the abuse and abandonment, Mr. Ross nevertheless understands the adversities and challenges that his mother faced. Yet, for years, he demonstrated confusion, anger and behavioral issues due to his toxic childhood.

The childhood adversities heaped upon Quaveon Ross had severe and far-ranging consequences. 10 years-old and homeless, with no parental supervision or discipline, he took to life on the streets. He associated with a bad crowd, and he started drinking alcohol and using drugs. (*See* PSR ¶¶ 95, 111-117). His drug use, while initially recreational, quickly accelerated to the point that he smoked marijuana daily and heavily. By 14, he was experimenting with other drugs and addicted to painkillers. (*Id.*). He was self-medicating and escaping his problems. While just a pre-teen, Mr. Ross needed to find a means to survive and support his growing drug addiction. And yet he was neither prepared for nor aware of any legitimate way to do so. All the while, he harbored psychic trauma from his childhood experiences. Unsurprisingly, Mr. Ross succumbed to negative influences and resorted to crime. In 2012, at the age of 15, Mr. Ross was arrested for the first time for a group robbery and was placed in juvenile detention for 18 months. (*See* PSR ¶¶ 74, 96). Since then, he has been almost continuously institutionalized; shuffled through prisons, juvenile detention facilities, group homes and foster care, exacerbating his mental health issues. (*See* PSR ¶¶ 95-98; *see also* Pearson Report at p.3).

In prison from 2017 through 2019, Mr. Ross met the only people in his life who ever showed him kindness, empathy and care, the 59 Brims. They provided protection, clothing and food. (PSR ¶ 99). Though branded "gangsters" and members of a "racketeering organization," they were most fundamentally a group of similarly situated youths

REDACTED VERSION

who had shared many of the same life experiences and adversities.  Like Quaveon Ross, many came from dysfunctional, incomplete families; received little parental or family guidance; had little academic direction or support; experienced the loss of parents, family members and friends to the criminal justice system, often repeatedly; and lived in poverty.  (*See, e.g.,* Judge Nancy Gertner, *How to Talk About Sentencing Policy – and Not Disparity*, 46 Loy. U. Chi. L.J. 313 (2014)).  Predictably, Mr. Ross continued to seek unconditional love and support from them after his release from custody in October, 2019, leading to his participation in the instant offense.

Indeed, as the Hon. Jack B. Weinstein detailed (complete with reference to statistical analysis and in-depth studies) in *United States v. Bannister*, 786 F.Supp.2d 617 (E.D.N.Y. 2011), the cumulative effect of poverty, racial segregation, undereducation, antisocial ethics and fatherlessness result in a community and sub-culture that cannot be overcome by youths like Quaveon Ross left rudderless on their own.  Mr. Ross was brought into the dysfunctional world of drugs and violence and his fate was in the hands of parents who themselves failed to overcome the environmental hardships.  Moreover, they were unable to equip their son with the skills necessary to become a productive member of our society.  That Quaveon Ross lacked parental guidance and childhood positive influence ensured that he would not overcome the crippling and debilitating circumstances into which he was born and raised.

### Mental Health and Substance Abuse Issues

The downward descents of Quaveon Ross' mental health and substance abuse, as well as their causes, are well-documented and apparent.

Throughout his life, he was prescribed numerous medications which he took sporadically (*Id.*), frequently opting instead to self-medicate with illegal drugs because he did not like the way the medications made him feel.

The sensible, obvious conclusion from analyzing the causes and consequences of Mr. Ross' circumstances is that he requires long-term, comprehensive treatment for mental health and substance abuse.  We believe that Probation's below-Guidelines sentencing recommendation is, at least in part, an acknowledgment of Mr. Ross' traumatic past and resulting issues, as well as his need for treatment and education.  (*See* PSR at pp. 35-37).

Accompanying this submission is the Forensic Psychological Assessment of Jessica Pearson, Psy.D. ("Pearson Report").  (Exhibit A).  Dr. Pearson is a clinical and forensic psychologist who interviewed and tested Mr. Ross for purposes of evaluation, providing an assessment of his psychological functioning and providing a treatment recommendation.  Dr. Pearson's evaluation confirms that Mr. Ross has suffered from years of severe

**REDACTED VERSION**

psychological and emotional disorder that were caused by traumatic events during his childhood:

It is our understanding that there is a growing body of scientific evidence that link childhood exposure to violence and domestic abuse with impaired decision-making in the adolescent brain, leading to violent and criminal behavior. Research has established that neurological development most critical to judgment, moral and ethical decision-making and controlling impulsive behavior is not complete during adolescence, which is when Mr. Ross experienced the worst of physical and emotional abuse. (*See, e.g.,* Equal Justice Initiative, Cruel and Unusual: Sentencing 13 and 14 Year Old Children to Die in Prison (2007)). Just as positive experiences can assist with healthy brain development, maltreatment or other forms of stress during childhood can negatively affect brain development. (*See Understanding the Effects of Maltreatment On Brain Development*, https://www.childwelfare.gov). Childhood maltreatment can not only lead to diminished behavioral, social and emotional functioning, it can lead to actual changes in brain structure and chemical activity, resulting in diminished functioning in brain areas, including those related to learning and memory. (*Id.* at 5-8). Chronic childhood stress or repeated trauma, as Mr. Ross experienced, can produce a persistent fear response, hyperarousal, anxiety, depression, diminished executive functioning, weakened response to positive feedback and a perception of threats even in safe environments, all of which can lead or contribute to aggressive behaviors. (*Id.* at 8-9). These effects can continue to influence brain development and activity into adulthood. (*Id.* at 9). We submit that whether Mr. Ross' psychological and emotional health issues were inherited, germinated from observation and

**REDACTED VERSION**

experience at a young age, were the product of some other socio-economic factors, or some combination thereof, is subordinate to the awareness that present in his history are a number of risk factors that support that there is a direct correlation between his past and his criminality for which he is blameless.  (*See, e.g.,* Melissa S. Kearney and Benjamin Harris, *The Economic Facts about Crime and Incarceration in the United States*, BROOKINGS INSTITUTION, THE HAMILTON PROJECT, May 1, 2014.  *See also*, *Graham v. Florida*, 560 U.S. 48 (2010)).

As detailed above, Quaveon Ross' extensive history of poly-substance abuse began when he was just an adolescent, homeless and living on the streets.  Given his childhood experiences, Mr. Ross' own debilitating substance abuse was practically pre-ordained.  Initially recreational, his drug use developed into a poly-substance addiction that was rooted in escape and numbness.  By 14 he was drinking, smoking large quantities of marijuana and addicted to painkillers.  (*See* PSR ¶¶ 95, 111-117).  At 17, he participated in his first substance abuse treatment program.  (PSR ¶ 115).  Although Mr. Ross participated in a number of drug treatment programs in the past, he was never able to maintain sobriety for any significant duration of time and his substance abuse continued unabated throughout his life.  (*See* PSR ¶¶ 111-117).

All of Mr. Ross' criminality can be directly traced to the volatile mixture of untreated mental illness coupled with substance abuse.  We also submit that Mr. Ross' conduct was not only borne of an inability to cope with his issues, but from desperation and an inability to legitimately survive and support himself.  Mr. Ross' life circumstances – the absence of any viable educational and vocational achievement on his part, combined with emotional and mental health issues and substance abuse – were never conducive to anything other than his continued criminality.  Accordingly, Dr. Pearson recommends intensive residential treatment for substance abuse and mental health, combined with educational or vocational programming.[2]  (Pearson Report at p. 9).  This will best prepare Mr. Ross for his future and reduce the likelihood of recidivism.  Probation agrees.  (*See* PSR at p. 36).

Significantly, Mr. Ross has demonstrated the motivation and desire to overcome his issues.  (*See* PSR ¶¶ 109-110, 117; *see also* Pearson Report at pp. 5, 9).  The impact of his arrest in the instant matter and his dedication to a better future life motivate Mr. Ross to reform.  He has always welcomed mental health treatment, and he now recognizes the severe effect that substance abuse had had on his life.  He has consistently requested treatment during the pendency of this case and has only recently finally begun receiving and taking mental health medications.  He demonstrates that he values his life and is truly prepared for recovery.  That Mr. Ross has independently demonstrated the motivation to overcome his challenges is critical.  The unfortunate reality is that for substance abuse

---

[2] Dr. Pearson also notes that Mr. Ross' sporadic treatment and access to medications have likely contributed to his altercations while incarcerated.  (Pearson Report at p. 9).

REDACTED VERSION

and psychological disorder, structure and daily support are absolutely necessary.  Treat-
ment of mentally ill and chemically addicted ("MICA") individuals is a highly specific
undertaking.  Where treatment for one fails to address the other, failure is inevitable.  A
supportive environment that can facilitate his already-demonstrated desire to meet his
challenges is necessary for a successful recovery.

### *Post-Incarceration Plan*

It is truly unfortunate that as a child, Quaveon Ross did not have the benefit of
parental guidance, discipline and leadership.  For he is clearly an intelligent and thought-
ful person who would have benefited greatly from the promotion of academic or voca-
tional achievement.  Due to the combination of his psychological and emotional issues,
learning disabilities, the absence of any stable family life, and the pull of negative influ-
ences, Mr. Ross was never equipped to deal with his life's challenges.  He never mean-
ingfully or consistently applied the time, thought or effort to cultivate a productive life-
style.  The only viable opportunities with which he was familiar were learned on the
streets.  However, while detained, he sobered, matured and rethought his ways.  He dis-
tanced himself from other co-conspirators and gang-members.  He realized that, moving
forward, his greatest motivations are to salvage his future, and to attain the stability and
sense of belonging that he has never before enjoyed.  Thus, Mr. Ross took steps to edu-
cate himself, develop job opportunities and secure post-incarceration housing in a better
environment.

Mr. Ross has bettered himself by engaging in the limited educational opportuni-
ties available to him.  He completed five programs while detained at the Metropolitan
Correctional Center New York ("MCC") and Metropolitan Detention Center Brooklyn
("MDC"), which encompassed re-entry preparation and planning; life skills; vocational
training; social programming; and general education.  Mr. Ross is presently detained at
the Hudson County Jail, where educational programming is unavailable to him, although
he is on the wait-list for General Educational Development ("GED") preparation.  Mr.
Ross looks forward testing for his GED as soon as possible and we are confident that he
will succeed.

In preparing for the future, Mr. Ross has taken steps to secure housing and culti-
vate employment opportunities for his eventual release.  Cognizant that he must extract
himself from the negative influences of his old haunts, Mr. Ross plans to live with his
twin sister, Quatiya, with whom he shares a closeness and bond.  (PSR ¶ 101).  They plan
to move out of New York City and to a better, safer neighborhood, as soon as they can
save up enough and afford it.  In formulating his own goals, he has made sensible plans
and he has also reached out to family to cultivate additional job options.  While incarcer-
ated, Mr. Ross plans on testing for his GED, and he will engage in programming related
to construction while he obtains his Occupational Safety and Health Administration
("OSHA") certificate and commercial driver's license.  (*See* Letter of Quaveon Ross,
submitted herewith at Exhibit B).  His uncle, Wayne Polk, works in construction and his

REDACTED VERSION

half-brother, Jose Gonzalez, works for a hospital.  Both individuals have pledged to assist Mr. Ross in finding work.  Mr. Ross hopes to work, save and eventually realize his dream of working somehow in marine biology or scuba diving.  (*Id.*).  He believes that each of these work possibilities will align with his skills and abilities, while helping him to repay society.  They are plans that are both feasible and meaningful.

Clearly, Mr. Ross has used his time to evaluate his life and prepare for his future. It is the first time in his life that he has dedicated his energies toward long-term positive endeavors.  Based upon his work ethic and proactive preparation for his future, Mr. Ross demonstrates that he is now capable of leading a productive, law-abiding life.  We submit that Mr. Ross possesses all of the tools to advance himself, but his life circumstances have never been conducive to anything other than failure.   Mr. Ross has taken steps to ensure that he will be in a position to succeed.  He is just scratching the surface of his potential.  We ask that the Court recognize that, despite challenges and wrongful decisions, Mr. Ross has shown promise, learned valuable lessons and is motivated to better himself.

### *Acceptance of Responsibility*

Submitted herewith is a heartfelt letter to the Court from Mr. Ross which appropriately expresses remorse, accountability and acceptance of responsibility for his actions in this matter.  (*See* Exhibit B).  Throughout the sentencing process, Mr. Ross has been straightforward and candid.  He has never diverted blame to other individuals or circumstances, nor has he offered excuses to condone his conduct.   Equally important, he s aware that, in order to break his self-destructive cycle he must address his mental health and substance abuse and he is eager to engage in treatment.   This shows that Mr. Ross values his future and is a strong indicator that, with guidance and assistance, Mr. Ross will redeem himself.  Mr. Ross' age, positive steps toward rehabilitation and his post-incarceration plan support that he poses little risk of recidivism.  Mr. Ross hopes that this Court will understand his life circumstances, show lenience and impose a sentence that will allow him to move forward.

## THE OFFENSE CONDUCT

Quaveon Ross pled guilty to conspiracy to distribute and possess with the intent to distribute crack cocaine.  Without a doubt he fully admits guilt and accepts responsibility for his participation in the conspiracy.  However, we submit that Mr. Ross' participation in the offense of conviction was limited to his position as a low-level street seller. There is no dispute that Mr. Ross was not an organizer, leader, manager or supervisor of the conspiracy.  We therefore submit that the Guidelines' offense level is excessively severe, given what we know about the nature of Mr. Ross' criminality.

A primary goal at sentencing is the determination of the fair and appropriate punishment for what Mr. Ross actually did.  This Court must identify the conduct for which

**REDACTED VERSION**

Mr. Ross is to be held accountable, in its context.  We recognize the Court's need to address an admittedly serious offense and provide general deterrence.  Yet, the advisory Guidelines sentence range is a punishment far greater than necessary under the circumstances, and unbefitting of Mr. Ross' role as a street seller.

      The Guidelines' adjusted offense level 25 is simply excessive given that Mr. Ross engaged in street sales of relatively *de minimis* amounts of drugs, during a circumscribed period of time,[3] in return for small amounts of money.  That offense level – which is consistent with mid- to higher-level drug traffickers – is driven by the aggregate quantity of drugs distributed in small amounts over the duration of the investigation and is not an accurate reflection of role.  Indeed, as elaborated in two decisions, *United States v. Diaz*, 11 Cr. 821 (JG), 2013 WL 322243 (E.D.N.Y. January 28, 2013); and *United States v. Dossie*, 851 F.Supp.2d 478 (E.D.N.Y. 2012), our sentencing structure for drug offenses is deeply flawed and overly punitive.

      The computation of punishments to defendants based upon weight and drug type, rather than role and real-world circumstances, has produced unfairly harsh consequences that were not based upon empirical data and not intended by the legislation.  *See, e.g., Diaz*, 2013 WL 322243 at 6, 11-13; *Dossie,* 851 F.Supp.2d at 480-481.  This is so because drug quantity is a poor proxy for culpability.  *Diaz*, 2013 WL 322243 at 13.  Drug weight is not a failsafe indicator of culpability, role or importance in a drug business.  *See Dossie*, 851 F.Supp.2d at 481.  The appropriate punishment should be meted out based upon the determination that a defendant in fact held a position and played a part worthy of such punishment.  Where, as here, a punishment is gauged by drug weight alone, the draconian sentencing ranges serve to unfairly punish individuals for whom the harsh sentences were not intended.  We thus urge the Court to recognize that the Guidelines in narcotics offenses are deeply flawed, particularly as applied in the instant matter.  In its discretion, the Court is free to disagree with the policies as embodied in the Guidelines and vary in its sentencing determination.

      Perhaps as important as the specifics of Mr. Ross' actual participation in the offense is the motivation for that participation: he did the only thing of which he was  capable to survive and to afford drugs for his own self-medicating addiction.  The nexus between Mr. Ross' drug addiction, mental health and criminality is clear.  Mr. Ross sold drugs not to amass wealth but to subsist and use drugs on a day-to-day basis.

      It is important to emphasize that this submission does not attempt to minimize or excuse Mr. Ross' conduct; he was at all times aware of the wrongfulness of his actions in this matter.  However, we respectfully submit that the circumstances and context of Mr. Ross' conduct are crucial to the determination of the appropriate sentence and the Court

---

[3] Mr. Ross participated in the instant conspiracy from his release from prison in or about October, 2019, through March, 2020, as reflected in the plea agreement.

**REDACTED VERSION**

should consider that Mr. Ross: (i) was not a leader, manager or organizer within the conspiracy; (ii) was a low-level street dealer of *de minimis* amounts of drugs; (iii) participated in the conspiracy for a circumscribed period of time; (iv) had an extensive history of mental impairment and substance abuse which fueled his criminal conduct; and (v) has taken meaningful steps toward his rehabilitation, supporting that he poses reduced risk of ever again engaging in conduct of this nature.  We thus urge the Court to recognize that the Guidelines not only fail to account for Mr. Ross' history and characteristics, they are incongruous to his offense conduct.

## THE APPLICABLE LAW

In *United States v. Booker*, the Supreme Court expressly invalidated the provision in 18 U.S.C. § 3553(b)(1) which made the Sentencing Guidelines mandatory, and rendered the federal sentencing statute "effectively advisory."  *United States v. Booker*, 543 U.S. 220, 245 (2005).  The impact of *Booker* is that Guidelines sentencing calculations do not bar a sentencing court from using 18 U.S.C. § 3553(a) factors as a basis to arrive at more appropriate sentences.  Sentencing courts are now permitted to weigh factors previously prohibited to achieve an appropriate and reasonable sentence.  This means that when a sentencing court finds a disproportionate relationship between the punishment prescribed by the application of the guidelines calculations and the particular facts and circumstances of a defendant, an alternative, more appropriate sentence may be imposed.  *See also Kimbrough v. United States*, 552 U.S. 85 (2007).

In *Rita v. United States*, 127 S.Ct. 2456 (2007), the Supreme Court clarified that the task of the sentencing court requires an individualized assessment of the sentencing objectives enumerated in 18 U.S.C. § 3553(a) for the particular defendant before it, and in the context of all relevant characteristics of that defendant.   127 S.Ct. at 2464-2465.  The Supreme Court in *Rita* held that the abuse-of-discretion standard applied to appellate review of sentencing decisions within Guidelines range but that, while a sentence within an advisory Guidelines range may bear a presumption of reasonableness upon appellate review, the Guidelines are, at best, only a "rough approximation of sentences that might achieve § 3553(a)'s objectives."  *Id.* at 2465.  It is beyond cavil that "sentencing courts, applying the Guidelines in individual cases may depart (either pursuant to the Guidelines or, since *Booker*, by imposing non-Guidelines sentence)."  *Id.* at 2464.

Beyond the mere mechanical calculation of the Guidelines, a sentencing court clearly must assess the unique aspects and circumstances of a case in fashioning the sentence.  The Guidelines are not a substitute for the district court's assessment and discretion at sentencing.  Rather, they are but one among numerous factors to be considered.  Just as the Supreme Court in *Rita* rejected the blanket presumption of reasonableness for within-Guidelines sentences, in *Gall v. United States*, 128 S.Ct. 586 (2009), the Supreme

REDACTED VERSION

Court rejected the presumption of unreasonableness for sentences outside calculated Guidelines ranges.

In *Gall*, the Supreme Court held that the Guidelines should be the "starting point and the initial benchmark" for a district court's analysis of a reasonable sentence. Equally important, the sentencing judge "may not presume that the Guideline range is reasonable" and "must make an individualized assessment based on the facts presented." *Id.* at 596-597. Moreover, the Supreme Court rejected the appellate rule that required "extraordinary" circumstances or "rigid formulas" to justify a sentence outside the Guidelines range. *Id.* at 595. Thus, a sentencing court, after considering the advisory Guidelines sentencing range, is free to fashion a sentence that is reasonable and appropriate based upon all of the sentencing factors set forth in § 3553(a). *See also United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) (The obligation to consider the calculated Guidelines range "does not mean mandatory adherence.").

### Quaveon Ross' Criminal History Category Over-Represents the Severity of His Criminal History

In *Booker*, *Rita*, and *Gall*, the Supreme Court expressly rendered the Sentencing Guidelines advisory rather than mandatory and provided the framework within which the Court may sentence the defendant in accordance with 18 U.S.C. § 3553(a) factors. The defendant respectfully requests that, in accordance with its broad discretion at sentencing, the Court utilize the analysis in *United States v. Mishoe*, 241 F.3d 214 (2d Cir. 2001 to determine the appropriate sentence for Mr. Ross.

In cases in which a strict Guidelines analysis and calculated Criminal History Category would result in an inappropriate and unduly harsh sentence, the Court can now impose a sentence consistent with Title 18 U.S.C. § 3553(a) factors to arrive at an appropriate sentence. In *Mishoe*, the Second Circuit recognized the sentencing court's authority to make a particularized consideration of an individual's life to determine that a Criminal History Category over-represents the seriousness of his criminal record:

> The Sentencing Commission recognized that in some cases the numerical formula by which points for prior sentences of different severity determine the applicable CHC might result in a sentencing range that was either too lenient or too severe. "There may be cases where the court concludes that a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit future crimes." [*citing* U.S.S.G. § 4A1.3.] In that event, a court may "consider a downward departure from the guidelines."

*Mishoe*, 241 F.3d at 218.

We recognize that the issue presented in *Mishoe* was in the context of a "departure." To be clear, this submission does not seek a departure. Rather, we submit that af-

REDACTED VERSION

ter *Booker*, *Rita*, and *Gall*, this Court, in assessing the advisory Guidelines sentence rec-ommendation, is at liberty to consider whether a defendant's criminal history category is overstated.

The Second Circuit's decision in *United States v. Preacely*, 628 F.3d 72 (2d Cir. 2010), is guiding.  In *Preacely*, the Second Circuit found that the district court erred pro-cedurally in its sentencing determination by failing to articulate that it had fully consid-ered 3553(a) factors in fashioning its sentence.  The Second Circuit expressly emphasized that a sentencing court is free to apply the analysis utilized in *Mishoe* to consider whether a Guidelines calculation over-represents the seriousness of the defendant's criminal histo-ry and make "a so-called 'horizontal departure' from the career offender Guideline and adopt a lower criminal history category" and arrive at a more reasonable sentence.  628 F. 3d at 80.

Therefore, application of *Mishoe* to this case not only permits, but compels a sen-tence outside of the advisory Guidelines range in determining the reasonable sentence for Mr. Ross under 18 U.S.C. § 3553(a).  It is clear that *Mishoe*, in relation to Guidelines analysis, recognized the Court's authority to horizontally depart in circumstances such as these.  Similarly, this Court has the ability to utilize the *Mishoe* analysis to determine that the Guidelines calculation of Mr. Ross' Criminal History Category is excessive and re-sults in a disproportionately severe sentence range.

## APPLICATION OF TITLE 18 U.S.C. § 3553(a)

An application of Title 18 U.S.C. § 3553(a) weighs in favor of Mr. Ross receiving a sentence of 60 months of incarceration.

18 U.S.C. § 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary," to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant, *inter alia*.  The ultimate goal of the sen-tencing court is to find just punishment by carefully balancing important public policy considerations along with the prophylactic and rehabilitative objectives of 18 U.S.C. § 3553(a).

18 U.S.C. § 3553(a) directs a sentencing court to consider: (1) the nature and cir-cumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the defen-dant, and (D) to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the Guidelines range and sentence; (5) any pertinent policy

REDACTED VERSION

statement; (6) the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

Our recommended sentence exacts a significant punishment and would achieve the goals of sentencing as set forth in § 3553(a). The imposition of this sentence would impress upon Mr. Ross the seriousness of the offense and society's displeasure with his conduct.

### § 3553(a)(1):  Nature and Circumstances of the Offense and the History and Offender Characteristics

It is indisputable that the offense involved in the instant matter is serious and warrants punishment. As we have proffered throughout this submission, however, the circumstances and nature of this particular individual show that Mr. Ross is before the Court due to the confluence of truly tragic circumstances.

Mr. Ross has demonstrated accountability, genuine remorse and the motivation to redeem himself. He has identified his substance abuse, mental health issues and negative environment as primary destructive influences in his life and, commendably, he has already begun to prepare himself for the future so that he can re-enter society as a meaningful contributor and responsible citizen.

### § 3553(a)(2):  The Need for the Sentence Imposed:
   #### (A) To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense;
   #### (B) To Afford Adequate Deterrence to Criminal Conduct;
   #### (C) To Protect the Public from Further Crimes of the Defendant;

Our recommended sentence of 60 months of incarceration is a significant punishment by any measure. It provides severe punishment without unnecessarily draining our society and perpetuating the cycle of poverty and. It would appropriately reflect society's designation of the instant offenses as serious and meritorious of substantial punishment, promote respect for the law and provide just punishment. Such a sentence would also provide adequate deterrence and protect the public because Mr. Ross' efforts demonstrate that there is little chance of recidivism and that he will indeed engage in a productive, law-abiding lifestyle.

We respectfully request that, in determining the "just punishment," the Court exercise its sentencing discretion to account for the harsh conditions of Mr. Ross' detention during the pendency of this case. Mr. Ross has already been severely punished by way of his experiences while detained. Until recently, Mr. Ross has been on lockdown due to the COVID-19 pandemic. During such lockdown conditions Mr. Ross was confined to his cell for 23 hours per day, with no visitation and only limited phone contact with his family. He was allowed out of his cell for about 30 minutes to an hour each day, within which

**REDACTED VERSION**

time he showered, attended to personal needs and made short telephone calls. His meals were served cold. He had no ability to: exercise or get physical activity; interact with other prisoners; engage in religious services; access the law library; or engage in educational programming. Mr. Ross also endured multiple quarantines, in which he was detained under solitary confinement conditions for multiple-week periods. Further, the environments in prison, unstable and chaotic under the best of circumstances, had heightened stress and anxiety levels due to fear of infections, poor conditions and the effects of isolation. This period was particularly stressful for Mr. Ross. We believe that the conditions of confinement are an important factor in the determination of the appropriate punishment and the restrictive, dangerous and plainly inhumane conditions of Mr. Ross' confinement merit serious consideration.

In light of inmates' acute exposure to a rampantly infectious and deadly disease, a number of Courts in this district — including this Court — have recognized that "the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals." *United States v. Jones*, 15 Cr. 95 (AJN), Dkt. No. 2865, at 6 (S.D.N.Y. May 26, 2020); *see also United States v. Gross*, 15 Cr. 769 (AJN), 2020 WL 1673244, at *2 (S.D.N.Y. Apr. 6, 2020); *United States v. Nkanga*, 450 F.Supp. 3d 491, 492 (S.D.N.Y. 2020); *United States v. Lizardi*, 11 Cr. 1032 (PAE), Dkt. No. 2523, at 8. As a result, Courts have increasingly granted variances at sentencing based on the harsh conditions at prisons both before and especially during the pandemic. *See, e.g., United States v. Polanco*, 20 Cr. 94 (AJN) (sentence of time-served, four-and-a-half months, for illegal reentry and false statement to an ICE officer, a variance from an advisory Guidelines range of 10-16 months based in part on conditions at the MDC during the pandemic and the likelihood that the defendant would remain detained until deported); *United States v. Paez Vazquez*, 20 Cr. 28 (JPO) (sentence of time-served, approximately six months, despite Guidelines range of 87 - 108 months, taking into account difficult conditions in detention during the pandemic); *United States v. Morgan*, 19 Cr. 209 (RMB) (considering brutal conditions at MDC before and during the pandemic and imposing a sentence of time-served — less than 15 months — where stipulated Guidelines range was 33-41 months and actual applicable guidelines range was 41-51 months); *United States v. Pierson*, 14 Cr. 855 (LTS) (time-served sentence of less than two months on Violation of Supervised Release where Guidelines advised 6-12 months). For example, during one recent sentencing, Judge Analisa Torres explained that the Court's decision to impose a time-served sentence of three months where the Guidelines suggested 5-11 months rested in part on the reality that detention for three months during "ordinary times is very different from being detained for three months during the COVID-19 pandemic" due to "additional burdens, including increased risk of infection, along with other complications such as the suspension of legal and family visits." *United States v. Rivera*, 16 Cr. 66 (AT).

Incarceration during the pandemic is undeniably much more punitive. As Judge Engelmayer recently observed, "[a] day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prison-

REDACTED VERSION

er beyond that imposed by an ordinary day in prison.  While such conditions are not in-
tended as punishment, incarceration in such circumstances is, unavoidably, experienced
as more punishing." *United States v. Lizardi*, 11 Cr. 1032-55 (PAE), Dkt. No. 2523, at 7-
8 (collecting cases) (releasing defendant with no underlying health issues, concluding that
the combination of COVID, jail conditions, the short period left on his sentence, and oth-
er 3553(a) factors constituted extraordinary and compelling circumstances).

Life is never intended to be easy while in prison.  However, Mr. Ross' incarcera-
tion experience has been far bleaker and harsher than normal.  In *United States v. Daniel
Gonzalez*, 18 Cr. 669 (JPO), Judge Oetken recounted the stark deprivations that inmates
have experienced during the pandemic, observing:

> And I do believe that because it has been harsher than a usual period, that
> it's more punitive, that it's essentially the equivalent of either time and a
> half or two times what would ordinarily be served.  So I think that having
> served 24 months is equivalent to having served three years.  That's what
> I believe in terms of how punitive it's been and how harsh it's been.

Consequently, although defendant Gonzalez faced a Guidelines range of 78 - 97
months' imprisonment, Judge Oetken imposed a sentence of time-served, which was the
equivalent of 28 months' imprisonment.  Like defendant Gonzalez, Mr. Ross has been
held under harsh conditions predating and during the pandemic.  Accordingly, we respect-
fully submit that in consideration of the brutal and harsh conditions he has endured dur-
ing his detention, along with all of the other mitigating factors presented, a sentence of 60
months is appropriate.

### §3553(a)(2) The Need for the Sentence Imposed:
#### (D) to provide the defendant with needed educational or voca-
#### tional training, medical care, or other correctional treatment in
#### the most effective manner;

Mr. Ross desires and needs continued vocational training in furtherance of his
previous efforts.  Mr. Ross fully intends to continue to make the most of his time and take
advantage of vocational training and educational programs available from the Bureau of
Prisons.  He also requests the Court's recommendation that he participate in dual treat-
ment for mental health and substance abuse issues.  Addressing those issues is the only
way to decrease the likelihood of recidivism and give Mr. Ross a real chance to advance
in life.  Mr. Ross also fully intends to avail himself of the vocational and educational pro-
gramming offered by the BOP.  We also request the Court's recommendation for the
BOP's long-term substance abuse program.  The BOP drug and alcohol substance abuse
program is highly regarded and, independent of mental health treatment, would afford
Mr. Ross the opportunity to treat and deal with his addictions over a lengthy period in a
structured environment.

REDACTED VERSION

### § 3553(a)(3):  The Kinds of Sentences Available

There is no legal impediment preventing this Court from imposing a sentence as suggested herein.  Indeed, the type of particularized analysis we seek operates to fulfill the goals of the Sentencing Reform Act by asking the Court to inspect the nuances of the life of the individual whom the Court is going to sentence, in conjunction with the nature and circumstances of the instant offense.

We are compelled to remind the Court of the enormous fiscal costs of incarceration.  The current monthly cost of imprisonment is approximately $3,688.00; the yearly cost of imprisonment is approximately $44,258.00.  (PSR at ¶ 141).  Thus, in addition to the destructive effects incarceration would have on Mr. Ross, it also imputes a large and unnecessary financial burden on our society.

### § 3553(a)(4):  The Guidelines Range and Sentence

We have discussed, at length, the inappropriateness of the advisory Guidelines sentencing range.  Nevertheless, we recognize the Court's obligation to consult and address the applicable Guidelines sentence.  We submit that, in the context of Mr. Ross' history and characteristics, the Guidelines' calculations result in an advisory sentencing range that is simply incongruous with Mr. Ross' background and history.  By expressly failing to consider a defendant's history, characteristics and life circumstances, the Guidelines not only fail to meet the congressional mandate behind 18 U.S.C. § 3553, they are a poor proxy for moral culpability.  The Guidelines are fundamentally flawed so as to be an insufficient sentencing guidepost.  Where, as here, a punishment is gauged by myopic, flawed Guidelines applications that serve to unfairly punish individuals, the Court is free to recognize those flaws and disagree with the policies as embodied in the Guidelines to vary in its sentencing determination.

We do not dispute that the Guidelines computation places Mr. Ross in Criminal History Category IV.  We submit, however, that because Mr. Ross' criminal behavior is a reflection of his tragic childhood and social history, a sentence based on CHC IV is disproportionate and overly punitive.  As set forth above, after *Booker, Rita, Gall* and *Mishoe*, the Court has at its disposal ample authority to formulate a sentence outside the Guidelines.  *See* U.S.S.G. §1B1.1(a), (b) and (c), *Background* ("If…the court imposes a sentence that is outside the guidelines framework, such a sentence is considered a 'variance.'") (quoting *Irizzary v. United States*, 128 S.Ct. 2198, 2200-03 (2008)).

Mr. Ross' personal history provides context for his criminal record; understanding that context – and looking past the mere number of convictions – supports a sentencing using a Criminal History Category less than IV.  The factors identified in *Mishoe* to assist a sentencing court in its assessment of the appropriateness of a defendant's criminal history category include, among others, a defendant's prior offenses, the amount of drugs involved and the sentences previously imposed.  *United States v. Mishoe*, 241 F.3d 214, 219 (2d Cir. 2001).

**REDACTED VERSION**

The primary consideration in a more "particularized inquiry" into Quaveon Ross' criminal history, as described by the Second Circuit in *Mishoe*, is that all of his prior conduct involved were symptomatic of his lifelong mental health issues and substance abuse. In the context of his life circumstances his life circumstances, Mr. Ross never engaged in the level of conduct suggested by CHC IV.  Rather, Mr. Ross' lifelong challenges dictated his life and criminality indicating: (i) that Mr. Ross resorted to crime to survive and to sustain his own addiction; and (ii) that Mr. Ross, institutionalized and suffering from angry behavioral issues, acted in a manner consistent with his background circumstances. That he is subject to Criminal History Category IV, due to a relatively limited criminal history that is rooted in a disturbing childhood and substance abuse is overly severe; it subjects him to a sentencing range that is disproportionate to his actual criminality and life circumstances.

Without minimizing the instant offense conduct, Mr. Ross has never engaged in the type of conduct, previously or served any incarceratory sentence that would warrant a sentence of over five years as an adequate deterrent.  In the case of Quaveon Ross, the extreme severity of the Guidelines sentencing range is far greater than necessary.  That Mr. Ross' longest previous sentence is 2 years must be considered when determining whether deterrent goals are met, or if the application of the Guidelines calculations is excessive as a deterrent and thus unnecessary.

We anticipate that the government will argue that Mr. Ross' prior arrests did not curb or deter his conduct, but we now know that Mr. Ross was never afforded the opportunity to equip himself with the tools necessary to effectively cope with his obvious deficiencies, the lack of education, his environmental surroundings, lack of guidance and substance abuse.

It is important to note at this juncture that we do not attempt to minimize Mr. Ross' criminal past.  We are however, asking the Court to consider that conduct in an analytical context as suggested by *Mishoe*.  Based upon the factors set forth herein, and relying on this Court's discretion to conclude that a strict application of the advisory Guidelines results in an inappropriate and unreasonable sentencing range, we respectfully suggest that the Court consider a variance from the Guidelines range, in accord with Mr. Ross' history and characteristics.

### § 3553(a)(5):  Pertinent Policy

Another factor supporting a downward variance is the likely passage of the "Eliminating a Quantifiably Unjust Application of the Law Act" ("EQUAL Act") in the near future.  This act, already passed by the House of Representatives and with bipartisan support in the Senate, is centered around eliminating the sentencing disparities for federal offenses involving crack-cocaine versus powder-cocaine.   These sentencing disparities

REDACTED VERSION

are clearly the results of unequal, race-based application of the law, as well as misinformation about the pharmacology of cocaine.

The impact of the EQUAL Act on the case of Quaveon Ross would be significant. Under the EQUAL Act, the 112-196 grams of crack-cocaine attributed to Mr. Ross' participation in the conspiracy would not trigger the 60-month mandatory minimum sentence of 841(b)(1)(B) (which is 500 grams of cocaine). Rather than the present plea agreement's base offense level 26, under the EQUAL Act, Mr. Ross would qualify for base offense level 16 (100-200 grams of cocaine), and the advisory Guidelines range would likely be 30-37 months of imprisonment, a range much more congruous with the facts and circumstances of Mr. Ross. We respectfully urge the Court to consider that the sentencing of Mr. Ross is precisely what is contemplated in our society's evolving philosophy toward punishment and imprisonment.

### § 3553(a)(6):  Avoiding Sentencing Disparity Among Similarly Situated Defendants.

The imposition of the requested sentence would not undermine the goal of avoiding sentencing disparity among similarly situated defendants, precisely because the bases for the sentence are the history and characteristics specific to Mr. Ross.

We direct the Court's attention to the sentences imposed upon co-defendants Darnell Cooper, Jose Rodriguez, Markell Bobian, Albert Shoulders and Robert Baley. Each of the aforementioned defendants received below-Guidelines sentences, and sentences well below the mandatory minimum 60-month sentence that we request for Mr. Ross. Mr. Ross is also similarly situated to these co-defendants in numerous respects, including age, criminal history and social history. Most importantly, each of the aforementioned defendants received sentences better than Mr. Ross is eligible for, even though they each were engaged in more egregious conduct (leadership, involvement in violent acts and greater quantities of drugs) than Mr. Ross. Accordingly, our sentencing recommendation — and Probation's — is consistent with the sentences of these co-defendants.

We understand that each defendant poses a unique set of circumstances, and Mr. Ross poses unique positives as well as challenges for the Court's consideration. However, for the reasons submitted herein, our recommendation for Mr. Ross is appropriately less severe than incorporated under the rubric of the Guidelines, and consistent with the Court's sentences of other defendants in this matter.

### SENTENCING RECOMMENDATION

Based on the foregoing, we respectfully request that Quaveon Ross be sentenced to 60 months of imprisonment coupled with a specific recommendation that Mr. Ross be designated to either FMC-Lexington. This request is premised upon the belief that Mr.

**REDACTED VERSION**

Ross is fundamentally of good character whose future contributions to his family and society far outweigh the societal benefit of his incarceration.  Mr. Ross has been chastened by his experience, has demonstrated accountability for his conduct and has shown through his actions that he is intent upon changing the trajectory of his life.  Incarceration, however, would only serve to undo all of the progress that Mr. Ross has managed to do and is capable of.

Mr. Ross now understands his transgressions and he understands that, moving forward, he must place himself in better situations, a better environment, and exercise better judgment.  More importantly, though, his history and actions demonstrate that he is poised to make these changes.  Imposing unnecessary incarceration to satisfy mythical standards of punishment and retribution offer little to society when there are such severe destructive effects.

We thank the Court for its consideration of the issues presented herein.

*Respectfully submitted,*

/s/ Richard J. Ma

Richard J. Ma, Esq.
Counsel to Defendant

cc: A.U.S.A. Peter Davis (via e-mail)
    Quaveon Ross